STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KEVIN RUBINO (CABN 255677)
KEVIN BARRY (CABN 229478)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7261
    FAX: (415) 436-7234
    Kevin.Rubino@usdoj.gov
    Kevin.Barry@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 19-CR-00026 WHA |
| | ) |
| Plaintiff, | ) **UNITED STATES' SENTENCING** |
| | ) **MEMORANDUM; MOTION FOR** |
| v. | ) **UPWARD DEPARTURE** |
| | ) |
| DAVID JAH, | ) Sentencing:  August 3, 2021 |
| | ) Time:  2:00 p.m. |
| Defendant. | ) Court:  19th Floor, Courtroom 12 |
| | ) |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     OFFENSE CONDUCT .......................................................................................2

      A.   Litigation Leading to the Attacks ..........................................................2

            1.     Legal Actions Related to the Sale of 670 ██ Avenue ..............3

            2.     The Lawsuit Filed by Mr. Jah's Son Against the SFPD .............3

      B.   The Attacks ..................................................................................4

            1.     Arson Attack No. 1:  March 2, 2016 in Danville .......................4

            2.     Two Drive-By Shootings:  March 7, 2016 in San Francisco ........5

            3.     Arson Attack No. 2:  May 27, 2017 in Oakland .......................6

            4.     Arson Attack No. 3:  May 29, 2017 in San Francisco ...............7

            5.     Arson Attacks Nos. 4, 5, and 6:  August 24, 2018 in San Francisco ......8

            6.     Arson Attack No. 7:  October 21, 2018 in San Francisco ..........8

            7.     Arson Attacks Nos. 8 and 9:  November 3, 2018 in Danville and Lafayette ......9

      C.   The Trial..................................................................................9

            1.     The Testimony of Mr. Jah's Co-Defendants.............................10

            2.     Mr. Jah's Attempts to Impede the Administration of Justice ......12

III.    THE GOVERNMENT'S SENTENCING RECOMMENDATION.........................13

      A.   Mr. Jah's Base Offense Level ..............................................13

      B.   Mr. Jah's Adjusted Offense Level .......................................13

            1.     Adjustment for Role in the Offense .......................................14

            2.     Adjustment for Attempted Obstruction of Justice ....................15

      C.   The Basis for an Upward Departure ....................................16

            1.     Uncharged Conduct Not Taken into Account in the Guidelines Range Justifies an Upward Departure.................................16

            2.     The Risk of Harm Posed by Mr. Jah's Attacks Was Substantially Greater than the Risk Posed by a Typical Arson. ....................17

IV.    THE 18 U.S.C. § 3553(A) FACTORS WEIGH IN FAVOR OF AN UPWARD VARIANCE FROM THE GUIDELINES RANGE ....................................18

A.   History and Characteristics of the Defendant ....................................................18

B.   Nature and Circumstances of the Offense ...........................................................19

C.   Need for the Sentence to Protect the Public from Further Crimes of the
     Defendant .............................................................................................................19

V.        CONCLUSION........................................................................................................19

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*United States v. Harper,*
  33 F.3d 1143 (9th Cir. 1994), *cert. denied,* 513 U.S. 1118 (1995) ....................................... 16

*United States v. Hogan*,
  942 F.2d 794 (9th Cir. 1991) ......................................................................................................... 16

*United States v. Markosian,*
  637 F. App'x 289 (9th Cir. 2015) ................................................................................................ 16

*United States v. Sopo*,
  431 F. App'x 596 (9th Cir. 2011) ................................................................................................ 16

**STATUTES**

18 U.S.C. § 3553(A) ........................................................................................................... 1, 15, 20

18 U.S.C. § 3553(a)(1) ................................................................................................................. 20

18 U.S.C. § 3553(a)(2)(C) ........................................................................................................... 20

18 U.S.C. §§ 844(i) .......................................................................................................................... 1

**RULES**

U.S.S.G. § 2K1.4 .......................................................................................................................... 19

U.S.S.G. § 2K1.4(a)(1) ........................................................................................................... 15, 19

U.S.S.G. § 2K2.1 .......................................................................................................................... 19

U.S.S.G. § 2K2.1(b)(1)(B) ........................................................................................................... 19

U.S.S.G. § 3B1.1 .......................................................................................................................... 16

U.S.S.G. § 3B1.1(a) ...................................................................................................................... 15

U.S.S.G. § 3B1.1(c) ...................................................................................................................... 19

U.S.S.G. § 3C1.1 ..................................................................................................................... 17, 19

U.S.S.G. § 5K2.0(a)(3) ........................................................................................................... 19, 20

U.S.S.G. § 5K2.21 ........................................................................................................................ 19

# I.   **INTRODUCTION**

The defendant David Jah has been convicted of one count of conspiracy to commit arson in violation of 18 U.S.C. §§ 844(i) and (n).  As alleged in the indictment and found by the jury, Mr. Jah hired two men to firebomb a home in Danville, California in the early morning hours of November 3, 2018.  But as this Court well knows, this attack was far from an isolated incident.  Rather, it was the culmination of a terror campaign lasting more than two years perpetrated by Mr. Jah against nine different individuals who he believed had wronged him one way or another, including multiple lawyers involved in Mr. Jah's eviction from his former home, his former neighbors in the Richmond District of San Francisco, and the city attorney assigned to defend against a lawsuit brought by Mr. Jah's son.  Mr. Jah's attacks have left lasting psychological trauma in communities throughout the Bay Area, as the statements submitted by his victims powerfully attest.  These individuals live in fear of the day that Mr. Jah is released, allowing him to resume his terror campaign.

The details of Mr. Jah's scheme are chilling.  They paint a picture of a man with a volcanic temper, who is capable of aggressively lashing out against those who stand in his way, as James Hannawalt experienced in Civic Center Plaza after Jah Jr.'s lawsuit was dismissed.  But perhaps even more concerning—and more relevant to this Court's sentencing determination—is the other side of David Jah.  The man who will lie in wait for years, watching for the right opportunity, before meting out his revenge.  This was the case with Bill Whiteman, for example, who had not been in contact with Mr. Jah since 2011, but who was awakened more than seven years later to the sound of shattering glass and the smell of gasoline and knew immediately that it was David Jah.

Of all his characteristics, it is this fixation on revenge, combined with a supreme patience, that most informs the government's sentencing recommendation in this case.  When he was out of custody, Mr. Jah commissioned firebombing attacks and drive-by shootings based on the smallest of imagined slights.  He has now been deprived of his liberty for years and, during that time, provided no reason to believe that his preoccupation with revenge has dissipated.  On the contrary, he shows no remorse for the harm he has inflicted, while insisting that he is being treated unjustly and that everyone who has testified against him is a liar.  If there is ever a case that cries out for specific deterrence, it is this one.

Because of this conduct, and the risk Mr. Jah continues to pose, the government recommends a custodial sentence of 180 months.  This recommended sentence contemplates that the Court will either depart upward from the guidelines under U.S.S.G. § 5K—in light of the wide range of aggravating conduct not otherwise captured by the calculation—or vary upward based on the factors set forth in 18 U.S.C. § 3553(a).

The government does not take this position lightly, but this is an exceptional case.  The sheer number of arson attacks orchestrated by Mr. Jah—nine attacks over two years—is extraordinary and would justify an upward departure on its own.  On top of that, these attacks were inflicted on families asleep in their beds with the express purpose of "terroriz[ing]" his victims, as Mr. Jah explained in a social media post.  These factors elevate Mr. Jah's conduct far beyond the ordinary arson offense, and his sentence should be determined accordingly.

## II.   OFFENSE CONDUCT

Because this Court presided over Mr. Jah's trial, it is familiar with the central details of Mr. Jah's firebombing conspiracy.  But the scope of Mr. Jah's scheme was far broader than was depicted to the jury.  The government did not attempt to admit evidence of several earlier incidents and attacks in order to maintain the focus on Mr. Jah's conspiracy with his co-defendants Dennis Williams and Kristopher Alexis-Clark.  The government provides that fuller background now.  All the evidence set forth below, which was included in Probation's Presentence Report (PSR) without objection, is well within the broad scope of materials that the Court may consider at sentencing.

### A.   Litigation Leading to the Attacks

The genesis of Mr. Jah's nine arson attacks lies in two legal proceedings: (1) a probate proceeding that ended with Mr. Jah's eviction from his former home at 670 ███ Avenue in San Francisco; and (2) a lawsuit filed by Mr. Jah's son, David Jah, Jr., against the city of San Francisco arising from his arrest at 670 ███ Avenue in 2014, when Mr. Jah still lived there.  Those two legal disputes are briefly summarized below.  All the individuals named in this summary were later targeted by Mr. Jah.

### 1.   Legal Actions Related to the Sale of 670 ███ Avenue

Mr. Jah lived at 670 ███ Avenue for many years in a house owned by his mother and aunt. After his mother and aunt died, Mr. Jah's cousin and the administrator of his aunt's estate, Kathy Pippins, sought to force a sale of that property.  PSR ¶ 13.  The resulting legal battle would last more than a decade, due in large part to legal challenges brought by Mr. Jah, nearly all of which were rejected. *Id.*

In 2010, Joseph Towey was retained as counsel for Mr. Jah's aunt's estate, and he continues that representation today.  *Id.* ¶ 14.  In 2010, William Whiteman served as counsel for the estate of Mr. Jah's mother.  *Id.*  Mr. Whiteman withdrew from that representation in 2011, after concluding he could no longer handle the matter effectively given Mr. Jah's interference.  *Id.*

Christy Styer was the court-appointed referee in the partition action.  She filed an action for forcible detainer in San Francisco Superior Court seeking to remove Mr. Jah from 670 ███ Avenue. *Id.*  John Michael Phelps served as Ms. Styer's attorney of record in that litigation.  *Id.*

Despite Mr. Jah's strenuous and sustained opposition, he was evicted from 670 ███ Avenue and the home was sold.  *Id.* ¶ 15.  Mark Freyman bought the house in February 2016.  *Id.*  Shortly thereafter, Mr. Jah's attacks began.

### 2.   The Lawsuit Filed by Mr. Jah's Son Against the SFPD

In 2014, while Mr. Jah was still living at 670 ███ Avenue, the police were called to that address because of reports of a large party.  *Id.* ¶ 16.  Mr. Jah's son, David Jah, Jr., was arrested.  *Id.*  He filed suit against the SFPD claiming numerous causes of action, including assault and intentional infliction of emotional distress.  *Id.*  Mr. Jah was heavily involved in the lawsuit and frequently appeared in court. *Id.*  The case continued for years before all the claims were dismissed and the city was awarded its costs. *Id.*

San Francisco Deputy City Attorney James Hannawalt represented the city in this lawsuit. Immediately after the lawsuit was dismissed, Mr. Jah confronted Mr. Hannawalt as he was leaving the courthouse and screamed at him, repeatedly calling him a "piece of shit" and threatening him.  *Id.* ¶ 17. Mr. Jah recorded this encounter and posted it on Instagram.  *Id.*  Below is an excerpt of Mr. Jah's diatribe.  *Id.*  The entire recording was admitted at trial, at Mr. Jah's invitation.

You piece of shit.  Huh?  Hey, when is the city attorney boxing committee gonna start, so I can join and beat yo ass, huh?  Train with you.  Piece of shit.  Huh?  How does it feel to be a piece of shit?  Huh?  Piece of shit, that's what you is.  Trump is my president so I can call you a piece of shit because that's what you are.  Make America great again.  Say what it is.  You piece of shit, that's what you is.

*Id*.  Throughout this verbal attack, Mr. Hannawalt can be seen attempting to walk away, saying nothing.  *Id*. ¶ 18.  In another portion of the recording, Mr. Jah can be heard screaming at Mr. Hannawalt's female paralegal:  "I want to grab your cooch like Trump but you smell like shit too."  *Id*.

In another video posted on Instagram, Mr. Jah discussed his son's litigation and referred to Mr. Hannawalt.  *Id*. ¶ 19.  Mr. Jah explained that he was trying to be as "civilized as possible" but soon he would have to "dress in [an] all black sweat suit and wear a mask and terrorize."  *Id*.  That was on November 30, 2016.  *Id*.  When Mr. Jah made this statement, the series of attacks intended to "terrorize" his victims had, in fact, already begun.

### B.  The Attacks

From the sale of his former home in February 2016 through his arrest in November 2018, Mr. Jah orchestrated nine arson attacks and two drive-by shootings against various individuals who he believed had wronged him in one way or another.  *Id*. ¶ 20.  Fortunately, no one was seriously hurt, but that was solely due to the incompetence of the men Mr. Jah hired to carry out these attacks.  *Id*.  By design these methods put the victims at risk of serious bodily harm or death, and they caused significant psychological trauma.  *Id*.  In at least one instance, described below, Mr. Jah expressed disappointment that an arson attack that engulfed a living room in flames had not led to greater damage.  *Id*. ¶ 38.

### 1.  Arson Attack No. 1:  March 2, 2016 in Danville

On March 2, 2016, shortly after midnight, a Molotov cocktail broke through the window of Joseph Towey's home at 126 Rassani Drive in Danville, California, spreading flames through his living room.  *Id*. ¶ 21.  The picture below depicting the damage was admitted at trial as Exhibit 6.  Just two weeks before this attack, Mr. Jah's former home had been sold over his objections.  *Id*.  As the attorney who filed the quiet title action on behalf of Ms. Pippins, Mr. Towey was partially responsible for that forced sale.  *Id*.



### 2.   Two Drive-By Shootings:  March 7, 2016 in San Francisco

A few days after the Molotov cocktail attack on Mr. Towey's home, there were drive-by shootings at the homes of the court-appointed referee, Christy Styer, and Mr. Jah's former neighbor, James Morris.  *Id*. ¶ 22.

For many years, Dr. Morris and Mr. Jah were next-door neighbors on ███ Avenue and had multiple conflicts.  *Id*. ¶ 23.  On March 6, 2016, after Mr. Jah had vacated his former home, Dr. Morris noticed that the ventilation grill on the garage at 670 ███ Avenue had been removed, which might allow someone to enter the house.  *Id*.  He called Christy Styer, the court-appointed referee to notify her, and she reported the information to the police.  *Id*.

Dr. Morris and Ms. Styer's homes were targeted in drive-by shootings less than 24 hours later. Shortly after midnight on March 7, four bullets were shot through the window of Dr. Morris' home at 678 ███ Avenue.  *Id*. ¶ 24.  Within 30 minutes, the San Francisco Police Department responded to shots fired at Ms. Styer's home as well.  *Id*.  Officers found six spent shell casings in the street outside her home, as well as broken front windows and bullet holes in the living room wall and couch.  *Id*.

When Mr. Jah's cellphone was seized by the police in 2018, a picture of Dr. Morris' bullet-riddled window was on the phone. *Id*. ¶ 25. Mr. Jah had shared this picture with his co-conspirators, Mr. Alexis-Clark and Mr. Williams, and told them it was retribution for Dr. Morris calling the police on him. *Id*. This image was admitted at trial as Exhibit 5.



### 3.   Arson Attack No. 2:  May 27, 2017 in Oakland

On May 27, 2017, the residence of Kathy Pippins, Mr. Jah's cousin and the administrator of his aunt's estate, was destroyed by a fire. *Id*. ¶ 26. She was asleep inside with her daughter when the fire began and had to quickly evacuate to escape the flames. *Id*. The Oakland Fire Department never identified the cause of the fire, but the next day, May 28, Ms. Pippins' address was found on a list of Mr. Jah's perceived enemies, with a large "X" drawn over her address. *Id*.

This list was discovered on the street in Tiburon, in front of the home of John Michael Phelps, the lawyer whom Ms. Styer hired to remove Mr. Jah from 670 ███ Avenue. *Id*. ¶ 27. In the middle of the night, two men, Jonathan Grimsley and Keith Willhite, were observed by the Tiburon police in a car in front of Mr. Phelps home. *Id*. After checking for warrants, the police released Mr. Grimsley and Mr. Willhite. *Id*. A short time later, Tiburon police officers returned to the site where they were parked to

check for any contraband left behind and located two small pieces of paper. *Id*. On the paper was listed seven addresses, all of which were the residences of persons related to Mr. Jah's legal proceedings. *Id*. This table provides these addresses in the order they appeared on the list and adds the resident's name and their connection to Mr. Jah.

| | Address | Resident | Connection to Jah |
|---|---|---|---|
| 1 | ▮ Uloa Street, San Francisco | James Hannawalt (former address) | Lawyer at the City Attorney's office who represented the San Francisco Police Department in the unsuccessful lawsuit filed by Mr. Jah's son |
| 2 | 678 ▮ Avenue, San Francisco | James Morris | Former next-door neighbor of Mr. Jah, who had several conflicts with him |
| 3 | 662 ▮ Avenue, San Francisco | Chris Olin | Former neighbor of Mr. Jah |
| 4 | 3355 C▮ Terrace, Lafayette | William Whiteman | Lawyer who represented Mr. Jah's mother's estate in the probate proceeding that led to the forced sale of Mr. Jah's former home at 670 ▮ Avenue |
| 5 | 126 Rassani Drive, Danville | Joseph Towey | Lawyer who represented Mr. Jah's aunt's estate in the probate proceeding that led to the forced sale of Mr. Jah's former home at 670 ▮ Avenue |
| 6 | 2921 ▮ Street, Oakland (with "X" drawn over it) | Kathy Pippins | Mr. Jah's cousin, who initiated the partition and quiet title action on behalf of Mr. Jah's aunt's estate |
| 7 | 5 R▮ R▮ Road, Tiburon | John Michael Phelps | Lawyer who prosecuted the eviction proceeding that removed Mr. Jah from 670 ▮ Avenue |

### 4. <u>Arson Attack No. 3: May 29, 2017 in San Francisco</u>

The day after the police found the address list in Tiburon, a fire was set at the Olin's residence at 662 ▮h Avenue in San Francisco, one of the addresses on the list. The SFPD reported that the front door to the house "had been scorched by the flames and a small inferno [] had been extinguished" prior to their arrival. They referred the case to arson investigators.

5. **Arson Attacks Nos. 4, 5, and 6:  August 24, 2018 in San Francisco**

On the night of August 24, 2018, three residences belonging to individuals associated with Mr. Jah were targeted with Molotov cocktails. *Id*. ¶ 28.  Geolocation data obtained from Google indicates that an individual named Maurice Holloway was present at all three attacks. *Id*.  Text messages found on Mr. Jah's phone show that he was communicating with Mr. Holloway throughout the day of the attack and the day following. *Id*.  These messages suggest that Mr. Jah hired Mr. Holloway to conduct these attacks and that Mr. Jah then traveled to at least two of the targeted homes the next day to inspect the damage. *Id*.

One of the attacks was against the home of Pierre Jospe, one of Mr. Jah's former neighbors on ██th Avenue. *Id*. ¶ 29.  Another of the attacks was against the home of Mark Freyman, who had purchased Mr. Jah's former home at 670 ██th Avenue but continued living at 406 A██████ Boulevard while 670 ██th Avenue underwent a gut renovation. *Id*.  And the third Molotov cocktail attack on the night of August 24, 2018 was against the home of Mr. Hannawalt, the San Francisco city attorney involved in the civil rights case against Mr. Jah's son, who Mr. Jah had verbally assaulted outside the courthouse nearly two years earlier. *Id*.

6. **Arson Attack No. 7:  October 21, 2018 in San Francisco**

Late on the night of October 21, 2018, a Molotov cocktail was thrown at 682 ██th Avenue, two doors down from Mr. Jah's former residence at 670 ██h Avenue. *Id*. ¶ 30.  The firebomb broke through a front window and set the living room on fire. *Id*.  The residents were Michael Walker and his family, who had never met Mr. Jah. *Id*.  As explained below, Mr. Jah hired his co-defendants Kristopher Alexis-Clark and Dennis Williams to attack 678 ██th Avenue, Dr. Morris' house, but they mistakenly hit Mr. Walker's house, which was immediately next door. *Id*. ¶¶ 31, 35.

Mr. Walker and his son used three fire extinguishers to attempt to put out the fire and removed burning furniture from the residence, sustaining burns on their hands and feet, but they were unsuccessful. *Id*. ¶ 30. The San Francisco Fire Department soon arrived to put out the fire, which caused an estimated $35,000 in damages. *Id*.  These images from the attack were admitted at trial as Exhibit 1.



### 7.   Arson Attacks Nos. 8 and 9:  November 3, 2018 in Danville and Lafayette

Mr. Alexis-Clark and Mr. Williams testified that they carried out two more arson attacks at Mr. Jah's direction.  First, in the early morning hours of November 3, 2018, they threw a Molotov cocktail through a front bedroom window of Mr. Towey's home at 126 Rassani Drive in Danville.  *Id.* ¶ 39. Fortunately, the double-pained window and storm shutter repelled the firebomb, which broke into pieces and landed in the driveway.  *Id.*

Then, less than an hour later, they threw a Molotov cocktail through the bedroom window of Mr. Whiteman's home in Lafayette.  *Id.* ¶ 40.  Mr. Whiteman testified that he and his family were awakened by the sound of glass breaking, and he could smell the strong odor of gasoline as the Molotov cocktail rolled under his bed where he was sleeping with his wife  *Id.*

### C.   The Trial

At trial, the government's presentation centered on Mr. Jah's conspiracy with Mr. Alexis-Clark and Mr. Williams, which spanned October and November 2018.

1

### 1.   The Testimony of Mr. Jah's Co-Defendants

In October 2018, Mr. Jah was introduced to Mr. Alexis-Clark by a prostitute that Mr. Jah met on a mobile dating application.  *Id.* ¶ 32.  Mr. Alexis-Clark and Mr. Williams unsuccessfully attempted to rob Mr. Jah while he was on a date with this prostitute.  *Id.*  Afterward, Mr. Jah told the woman that he had a paying job for Mr. Alexis-Clark, and she put the two of them in touch.  *Id.*

Mr. Jah then sent a list of six addresses to Mr. Alexis-Clark by text message, who shared the list with his cousin Dennis Williams.  *Id.* ¶ 33.  This address list included nearly all the same homes as the list found in front of Mr. Phelps' house in Tiburon in 2017.  *Id.* ¶¶ 33–34.  Just like the table above, this table adds the resident's name and their connection to Mr. Jah.

| | Address | Resident | Connection to Jah |
|---|---|---|---|
| 1 | 5 R▮▮ R▮▮▮▮Road Belvedere | John Phelps | Lawyer who prosecuted the eviction proceeding that removed Mr. Jah from 670 ▮h Avenue |
| 2 | 94 C▮▮▮▮▮ Drive San Francisco | James Hannawalt | Lawyer at the City Attorney's office who represented the San Francisco Police Department in the unsuccessful lawsuit filed by Mr. Jah's son |
| 3 | 3355 C▮▮▮▮ T▮▮▮ Lafayette | Bill Whiteman | Lawyer who represented Mr. Jah's mother's estate in the probate proceeding that led to the forced sale of Mr. Jah's former home at 670 ▮h Avenue |
| 4 | 126 Rassani Drive Danville | Joseph Towey | Lawyer who represented Mr. Jah's aunt's estate in the probate proceeding that led to the forced sale of Mr. Jah's former home at 670 ▮h Avenue |
| 5 | 678 ▮th Avenue San Francisco | James Morris | Former next-door neighbor of Mr. Jah, who had several conflicts with him |
| 6 | 406 A▮▮▮▮▮Blvd San Francisco | Mark Freyman | Purchaser of Mr. Jah's former home at 670 ▮h Avenue after his eviction |

At trial, Mr. Williams explained that the Molotov cocktail he threw at 682 ▮h Avenue had been intended for 678 ▮th Avenue, but accidentally hit the next-door neighbor's home because of Mr. Williams' poor eyesight.  *Id.* ¶ 34.  Two days after this attack, Mr. Jah sent both Alexis-Clark and

1   Williams text messages to the effect of "you bet on the wrong game." *Id*. ¶ 35.  Mr. Jah also sent Mr.

2   Alexis-Clark a message that said:  "A for effort but the task is not complete." *Id*.

3          A few days after that, Mr. Jah sent messages to both Mr. Alexis-Clark and Mr. Williams that

4   said: "Tassajara Valley, Danville, California Little League. Check your schedule. Make sure you have

5   the right park." *Id*. ¶ 36.  Mr. Alexis-Clark and Mr. Williams testified that this was a coded reference to

6   the address in Danville on Mr. Jah's list, 126 Rassani Drive.  *Id*.  Mr. Jah testified that this was not

7   code—he was in fact suggesting that they go to a little league game in Danville.  *Id*.

8          A few days later, October 31, Mr. Jah met with Mr. Alexis-Clark and Mr. Williams at a casino in

9   the East Bay. *Id*. ¶ 37.  According to Mr. Alexis-Clark and Mr. Williams, Mr. Jah expressed

10  disappointment about the attack on ██th Avenue on two bases.  *Id*.  First, they hit the wrong house.  And

11  second, the fire did not inflict more damage.  *Id*.

12         As Mr. Alexis-Clark testified, during their meeting at the casino, Mr. Jah made a fist and then

13  splayed out his fingers while saying words to the effect of "it didn't go through."  *Id*. ¶ 38.  Mr. Alexis-

14  Clark interpreted this as Mr. Jah saying that the firebomb did not explode.  *Id*.  With Mr. Williams, Mr.

15  Jah was even more explicit.  Mr. Jah showed Mr. Williams a news article about a recent arson attack in

16  San Jose in which the home was destroyed by fire.  *Id*.  Mr. Jah explained to Mr. Williams that this was

17  a successful arson, unlike the job Mr. Williams had done in San Francisco.  *Id*.  Mr. Jah earlier sent

18  Alexis-Clark a link to the same article.  *Id*.  Mr. Jah also told Mr. Williams that he would know that the

19  attack was successful when he heard a "whoosh" noise—the sound fire makes as it ignites and expands.

20  *Id*.

21         In the early morning hours of November 3, 2018, Mr. Alexis-Clark and Mr. Williams attacked

22  Mr. Towey's and Mr. Whiteman's homes in Danville and Lafayette with Molotov cocktails, as Mr. Jah

23  instructed.  *Id*. ¶¶ 39–40.  Their plan was to continue the attacks against the rest of the six addresses on

24  Mr. Jah's list, but Mr. Alexis-Clark and Mr. Jah were both arrested a few days later, on November 7,

25  2018.  *Id*. ¶ 41.

26         Mr. Alexis-Clark and Mr. Williams have both pled guilty to three crimes in connection with

27  these incidents:  (1) conspiracy to commit arson, (2) attempted arson, and (3) possession of an

28  unregistered Molotov cocktail.  *Id*. ¶¶ 8–9.

### 2. Mr. Jah's Attempts to Impede the Administration of Justice

At trial, Mr. Jah took the stand in his own defense and repeatedly perjured himself.  The most important false statement was Mr. Jah's blanket denial that he ever suggested that Mr. Alexis-Clark and Mr. Williams commit arson against the homes on his address list.  *Id.* ¶ 62.  When asked why, then, Mr. Jah had compiled a list of addresses of people with whom he had conflicts and sent the list to two men who had just tried to rob him, Mr. Jah explained that he simply intended to "waste their time."  *Id.*  He did not explain how or why he thought this would waste their time.  *Id.*

There are numerous other examples of Mr. Jah's perjury.  For example, when asked why he sent a message to Mr. Williams about a little league game in Danville, Mr. Jah denied that it had anything to do with Mr. Towey's address in Danville that he had previously sent.  *Id.*  According to Mr. Jah, he genuinely thought Mr. Williams should go to a little league baseball game in Danville.  *Id.*  In a startling addition to this obviously false testimony, Mr. Jah added:  "I've known Towey to be at that park with his grandchildren."  *Id.*

To take one more example, Mr. Jah was shown a picture of Mr. Hannawalt's home sent from his cellphone to Maurice Holloway's cellphone on August 25, 2018, one day after the Molotov cocktail attack on that house.  *Id.* ¶ 64.  Mr. Jah denied sending that message and claimed it might have been sent by someone else while borrowing his phone.  *Id.*  Mr. Jah added that the picture of Mr. Hannawalt's home might have been taken by an associate of Mr. Jah's in preparation for a non-violent protest in front of the house:  "I could have asked him if he's going that way, to take a picture and to see if Mr. Hannawalt was there, for us to be able to engage in protesting in front of his house of his unethicalness that I felt that occurred."  *Id.*  Likewise, Mr. Jah flatly denied sending a picture of Mark Freyman's home to Mr. Holloway shortly thereafter—again, even though this picture was sent directly from Mr. Jah's phone.  *Id.*

It was also revealed at trial that Mr. Jah attempted to intimidate his co-defendants and encouraged them to falsify their testimony.  First, Mr. Jah saw Mr. Alexis-Clark in jail shortly after he had admitted his involvement in the scheme with Mr. Jah.  Mr. Alexis-Clark testified that Mr. Jah said to him:  "You're dead."  *Id.* ¶ 65.

1    Similarly, after Mr. Williams was arrested, he was added to Mr. Jah's housing unit, despite

2    instructions to keep the co-defendants separated.  While there, Mr. Jah told Mr. Williams to sign a letter

3    saying that Mr. Williams did not conspire with Mr. Jah to commit arson.  *Id.* ¶ 66.  Knowing this was

4    untrue, Mr. Williams nevertheless signed the letter because he feared retribution from Mr. Jah if he did

5    not.  *Id.*

6    **III.    THE GOVERNMENT'S SENTENCING RECOMMENDATION**

7    The government recommends a custodial sentence of 180 months.  Based on an adjusted offense

8    level of 30, and a CHC of IV, Probation calculated a guidelines range of 135 to 168 months.  PSR ¶ 149.

9    Probation also noted that an upward departure from that range may be warranted based on the number of

10   attacks and the extreme risk of harm that they created.  *Id.* ¶ 165–166.  The government believes that

11   these two factors justify a total upward departure of four offense levels, for an offense level of 34, for

12   the reasons set forth below.  Even if the Court disagrees, and concludes that these factors warrant only a

13   2-level departure, Mr. Jah's guidelines range would still be 168 to 210 months (Offense Level of 32 and

14   CHC of IV), easily justifying the government's recommended sentence.  Alternatively, the Court should

15   vary upwards from the Guidelines range in consideration of the sentencing goals articulated in 18 U.S.C.

16   § 3553(a).

17   **A.    Mr. Jah's Base Offense Level**

18   The base offense level for conspiracy to commit arson is dictated by U.S.S.G. § 2K1.4(a)(1).

19   That section provides for an offense level of 24 if (A) the defendant knowingly created a substantial risk

20   of death or serious bodily injury to any person other than a participant in the offense, which includes, for

21   example, firefighters who might respond to the fire, or (B) the offense involved the attempted

22   destruction of a dwelling.  There is no dispute that those factors are present here and that Mr. Jah's Base

23   Offense Level is 24.  By instructing others to firebomb occupied homes, Mr. Jah simultaneously created

24   a substantial risk of serious injury and attempted to destroy a dwelling.

25   **B.    Mr. Jah's Adjusted Offense Level**

26   The government agrees with Probation's determination that a 6-level adjustment is appropriate

27   for (1) Mr. Jah's role the offense (four levels) and (2) his attempts to impede the administration of

28   justice (two levels).  Mr. Jah has objected to the inclusion of both these sentencing enhancements.

1.   **Adjustment for Role in the Offense**

As Probation has found, four levels are added to Mr. Jah's sentencing calculation because he was an organizer or leader in a criminal activity that included five or more participants.  PSR ¶ 72; U.S.S.G. § 3B1.1(a).  Mr. Jah recruited Mr. Alexis-Clark and Mr. Williams to commit this crime, and Mr. Jah was entirely responsible for identifying the targets of the conspiracy and the method the conspirators would use.  In addition, Mr. Jah hired at least three other men to carry out arson attacks—Mr. Holloway, Mr. Grimsley and Mr. Willhite—for a total of at least five participants.  Mr. Jah objects to the application of this enhancement on one basis only:  he claims that there is no evidence that he "exercised control" over any of the individuals he hired to carry out these attacks.  To date, Mr. Jah has not provided any authority or explanation for this objection, and he is mistaken.

At the outset, it is important to note that the Court can consider more than Mr. Jah's conviction offense to identify the five participants necessary to trigger the enhancement.  *United States v. Hogan*, 942 F.2d 794 (9th Cir. 1991) (citing U.S.S.G. § 3B1.1 cmt. 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.").).  In addition, Mr. Jah need not have led the activities of *all* the other participants; it is enough that he was the organizer or leader of *one* other participant, provided the overall criminal activity involved five or more.  U.S.S.G. § 3B1.1 cmt. 2.

Turning to the issue of "control," to sustain a finding that a defendant was an organizer or a leader, "there must be evidence that the defendant exercised some control over others involved in the commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime."  *United States v. Harper,* 33 F.3d 1143, 1151 (9th Cir. 1994), *cert. denied,* 513 U.S. 1118 (1995).  Multiple courts have found that recruiting participants to a scheme, and then instructing them on their role in the scheme, is more than a sufficient level of "control" to satisfy this enhancement.  It is not necessary, for example, that the organizer coerce the other participants or micromanage their activities.  *See, e.g., United States v. Sopo*, 431 F. App'x 596, 597 (9th Cir. 2011) (finding there was "ample evidence to support a 4-level leadership sentencing enhancement" because defendant "initially recruit[ed] the four to participate in the fraud scheme" and "instructed" them to make false representations); *United States v. Markosian*, 637 F. App'x 289, 293 (9th Cir. 2015) (4-level

1   enhancement applicable where defendant directed two participants to deposit checks and recruited

2   additional participants when the first two were arrested).

3         There is ample evidence to show that Mr. Jah had a sufficient level of control over the other

4   participants in this scheme, particularly with his co-defendants Alexis-Clark and Williams, who testified

5   at trial that Mr. Jah devised and led every aspect of their conspiracy.  First, this firebombing scheme was

6   entirely a creation of Mr. Jah, who identified the targeted individuals, their addresses, and the method of

7   attack.  Second, Mr. Jah recruited all the participants involved and promised them payment for their

8   participation. Third, he chose the order of the attacks and coached the participants as to how to carry

9   them out successfully.  In short, he created the scheme, directed the other participants about what to do,

10   and offered to pay them to do it.  No greater level of "control" is required.

### 2.      Adjustment for Attempted Obstruction of Justice

12         The government agrees with Probation's determination that a 2-level enhancement should be

13   added under U.S.S.G. § 3C1.1 because Mr. Jah attempted to impede the administration of justice.  There

14   are three bases for this enhancement, each of which is independently sufficient for its application.

15         First, Mr. Jah took the stand during his trial and committed perjury.  Perjury is always a basis for

16   this enhancement, even when the only perjured statement was a denial of guilt and regardless of whether

17   the defendant was convicted of perjury.  U.S.S.G. §3C1.1, cmt. 2 and cmt. 4(B).  Mr. Jah's perjury was

18   apparent to anyone who heard his testimony, including the jurors who unanimously found that he was

19   guilty beyond a reasonable doubt and therefore necessarily disbelieved his categorical denials.  Mr. Jah's

20   attempts to explain the damning text messages found on his cellphone were even less convincing.

21   Contrary to his testimony, Mr. Jah was not discussing sports bets or little league games in his messages

22   with Mr. Alexis-Clark and Mr. Williams about the "Danville Tigers" and "Lafayette Lions."  Nor is it

23   plausible that he lent his cellphone to someone who coincidentally took pictures of Mr. Hannawalt and

24   Mr. Freyman's homes one day after those homes were attacked with Molotov cocktails.

25         Second, Mr. Jah attempted to impede the administration of justice by trying to intimidate Mr.

26   Williams and asking him to produce a false document.  U.S.S.G. §3C1.1, cmt. 4(A), 4(C).  Specifically,

27   Mr. Williams testified that Mr. Jah told him to sign a letter saying that Mr. Williams did not conspire

28

with Mr. Jah to commit arson.  Tr. 685–686 (Williams).  Mr. Jah wisely decided not to submit this letter to the Court as evidence, but that is not a requirement for this enhancement.

Third, Mr. Jah threatened a co-defendant, which is also an independent basis for a 2-level enhancement.  U.S.S.G. §3C1.1, cmt. 4(A).  Mr. Alexis-Clark testified that Mr. Jah said to him "you're dead," shortly after Mr. Alexis-Clark admitted his guilt to the government and implicated Mr. Jah.  Tr. 460 (Alexis-Clark).

C.    **The Basis for an Upward Departure**

Once the 4-level enhancement for his role in the offense and the 2-level enhancement for attempted obstruction of justice are included, Mr. Jah's adjusted offense level is 30.  But that offense level does not remotely capture Mr. Jah's culpability.  This same offense level would apply if Mr. Jah hired men to carry out a single arson attack against a restaurant or office building with the purpose of collecting insurance proceeds.  Mr. Jah's conduct was far more dangerous, far more wide-ranging, and far more nefarious, and his sentence should reflect that difference.

1.    **Uncharged Conduct Not Taken into Account in the Guidelines Range Justifies an Upward Departure.**

First, Mr. Jah hired people to commit nine arson attacks, but the guideline calculation for arson does not take into account the number of attacks.  U.S.S.G. § 2K1.4.  As a result, in the absence of an upward departure, Mr. Jah would receive the same guidelines calculation as if he orchestrated just one attack.  To accommodate a situation such as this, Chapter 5 of the guidelines provides for an upward departure for "uncharged conduct" not taken into account by the offense-specific guidelines.  U.S.S.G. § 5K2.21; *see also id.* §5K2.0(a)(2)(B).

To determine the size of an appropriate upward departure, the government looks to other analogous guideline levels.  Elsewhere in Chapter Two, Part K (where the arson guidelines can be found), are the guidelines for unlawful possession of firearms.  U.S.S.G. § 2K2.1.  Under those guidelines, a defendant is subject to a 4-level enhancement if he possesses more than seven firearms.  U.S.S.G. § 2K2.1(b)(1)(B).  By analogy, Mr. Jah's nine arson attacks should be subject to an enhancement at least as great.

UNITED STATES' SENTENCING MEMORANDUM
19-CR-00026 WHA                                    16

2.     **The Risk of Harm Posed by Mr. Jah's Attacks Was Substantially Greater than the Risk Posed by a Typical Arson.**

Second, the guidelines do not fully take into account the risk of harm imposed by Mr. Jah's attacks. Mr. Jah had every reason to believe the homes he targeted were occupied by sleeping families. Indeed, that was the point. As Mr. Jah indicated in a video he posted on Instagram, his purpose in carrying out this scheme was to "terrorize" his victims.

Mr. Jah's base offense level of 24 already requires some de minimis risk of physical harm, as it applies when the offense involved the attempted destruction of a "dwelling" *or* the knowing creation of a "substantial risk of death or bodily injury." *Id*. § 2K1.4(a). But this increase applies even if only one of those conditions is present. *Id*. For example, it would apply if the defendant knew the building was uninhabited, and the risk of bodily injury only threatened firefighters responding to the blaze. *Id*. § 2K1.4(a) cmt. 2. By attempting to firebomb homes occupied by sleeping families, the risk of harm posed by Mr. Jah's conduct is far greater than the risk present in the typical arson offense.

In an "exceptional case" like this, the guidelines instruct that an upward departure may be warranted if a circumstance that has already been taken into consideration in calculating the guidelines is present to a degree "substantially in excess of" that which is normally involved. U.S.S.G. § 5K2.0(a)(3). That is exactly the situation here considering the extraordinary risk of bodily harm presented by Mr. Jah's conduct.

For all these reasons, the number of attacks as well as the exceptional harm they posed would each independently justify an upward departure of two or four levels. Nevertheless, the government conservatively recommends a total upward departure of four levels. Taking into account all the applicable enhancements, the government proposes the below guidelines calculation.

|  | **U.S.S.G. Section** | **Levels** |
|---|---|---|
| Base offense level | U.S.S.G. § 2K1.4(a)(1) | 24 |
|  | U.S.S.G. § 3B1.1(c) (Role in the Offense) | +4 |

| | U.S.S.G. § 3C1.1<br>(Obstructing or Impeding<br>Administration of Justice) | +2 |
|---|---|---|
| | U.S.S.G. §§ 5K2.0(a)(3), 5K.21<br>(Upward Departure for<br>Exceptionally Dangerous Conduct<br>and Multiple Uncharged Attacks) | +4 |
| Total Offense Level | | 34 |

## IV.   THE 18 U.S.C. § 3553(A) FACTORS WEIGH IN FAVOR OF AN UPWARD VARIANCE FROM THE GUIDELINES RANGE

In the alternative, the Court should vary upwards from the guidelines range because the government's recommended sentence of 180 months is sufficient but not greater than necessary to satisfy the sentencing goals articulated in 18 U.S.C. § 3553(a). While sentencing courts must consider each of the factors set forth in section 3553(a), the following warrant further discussion in this case: the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); and the need for the sentence imposed to protect the public from further crimes of the defendant, 18 U.S.C. § 3553(a)(2)(C).

### A.   History and Characteristics of the Defendant

Mr. Jah has been diagnosed with Asperger's syndrome, and some of the doctors who evaluated him identified evidence of a "personality disorder" and "mild depression." PSR ¶¶ 129–131. Probation finds these mental health issues "mitigating." *Id*. ¶ 168. The government disagrees. There are two scenarios in which mental health issues can be mitigating: (1) when the underlying condition limits the defendant's ability to distinguish between right and wrong and therefore diminishes his culpability or (2) when the underlying condition is identifiable and treatable and therefore mitigates the risk of recidivism. Neither scenario is present here.

Mr. Jah understood the significance of his actions at the time of his offense, according to the only doctor to opine on the issue. *Id*. ¶ 132. And the four mental health professionals who evaluated Mr. Jah were unable even to agree on the proper diagnosis, let alone identify a viable course of treatment. *Id*. ¶¶ 129–132. Therefore, Mr. Jah's mental health issues are not "mitigating" in the sense

of lessening his culpability or in the sense of reducing the likelihood that he will reoffend.

It is also concerning that, as Mr. Jah has aged, his conduct has escalated from primarily drug crimes and petty theft to the use of firearms and violence. Before he was 27 years old, Mr. Jah accumulated five misdemeanor convictions but no felonies. PSR ¶¶ 80–85. Since he turned 35, he has accumulated three felonies, including possession of meth while armed with a loaded pistol, and now a series of arson attacks carried out at the age of 44. *Id*. ¶¶ 92–93. Some offenders "age out" of their worst impulses and see their criminal records diminish or disappear as they fully mature. The opposite has happened here.

### B. <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense also justify a 180-month custodial sentence. No one was seriously hurt in Mr. Jah's attacks, but that was only because of the incompetence of his henchmen, and the blind luck of his victims. This was a situation that easily could have ended tragically. Indeed, there is every reason to think that that was Mr. Jah's intention. He expressed disappointment to Alexis-Clark and Williams when their first attack did not inflict more damage. He pointed them to another arson in San Jose, in which the targeted home was fully engulfed in flames, and encouraged them to do better. The potential for harm was severe. Mr. Jah is not entitled to leniency simply because the men he hired fell short of his intentions.

### C. <u>Need for the Sentence to Protect the Public from Further Crimes of the Defendant</u>

The need to protect the public, perhaps more than any other factor, weighs in favor of the government's recommended sentence. Mr. Jah shows an utter lack of remorse. He insists that all his victims, as well as the government, are simply lying about him. And he has a track record of quietly nursing grudges for many years before he lashes out in revenge. Every additional day that he is in custody is a day that the public is safer.

## V. <u>CONCLUSION</u>

For all these reasons, the government recommends a custodial sentence of 180 months.

1  DATED:   July 27, 2021                          Respectfully submitted,

2                                                  STEPHANIE M. HINDS
                                                   Acting United States Attorney
3

4                                                  _/s/ Kevin Rubino_____

5                                                  KEVIN RUBINO
                                                   KEVIN BARRY
6                                                  Assistant United States Attorneys

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28