UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DAVID JAH,

        Defendant.

No. CR 19-00026 WHA

**ORDER RE POST-TRIAL MOTIONS**

## INTRODUCTION

In this prosecution for conspiracy to firebomb the homes of persons on a list of enemies of defendant, who represented himself at trial, this order **DENIES** various post-trial motions.

## STATEMENT

Prior orders summarized the pretrial facts of this case (*see* Dkt. Nos. 276, 305, 519, 562). Count One of the second superseding indictment charges Section 844(i) and (n). Count Four charges possession, by a person convicted of a felony, of an AK-style firearm and ammunition. On defendant David Jah's motion, the two counts were severed and a trial on Count Four went first in March 2021. Mr. Jah terminated his lawyers and chose to represent himself. The jury found Mr. Jah not guilty of possessing ammunition but could not reach consensus on possession of the firearm.

Here follow the events of the second trial. The essence of the case is that Mr. Jah enlisted two men to firebomb homes on a list of six addresses. The homes at those addresses

all belonged to his enemies. One of those homes served as a law office of a practicing attorney. This was at 126 Rassani Drive in Danville, California. Both of Mr. Jah's co-conspirators testified against him.

On April 26, seven days before the arson conspiracy trial began, the government announced that it had recently learned "that a [Motorola] cellphone was seized from [co-defendant] Dennis Williams following his arrest in December 2018 but never copied or produced" and now would not power on. The government was ordered to try and recover the contents of the cell phone. Trial began May 3, 2021, with Mr. Jah again representing himself (again, by his choice). During trial, the government tried to recover data from the phone with no success. Mr. Jah moved for relief on the basis of destroyed evidence, under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). The Court deferred ruling until it heard evidence.

Mr. Jah's co-defendants, Williams and Kristopher Alexis-Clark, each testified for the government. At the close of the government's case, on May 11, Mr. Jah moved for a judgment of acquittal and filed a motion alleging a *Brady* violation (Tr. 1182–90, Dkt. No. 555). Mr. Jah testified in his own defense. At the close of the defense case, he filed a written renewal of his motion for judgment of acquittal (Dkt. 559). On May 12, the Court denied the motion to acquit and the *Trombetta-Youngblood* motion from the bench (Tr. 1430). A memorandum opinion followed (Dkt. No. 562). On May 13, the jury found Mr. Jah guilty of violating Section 844(i) and (n) (Dkt. No. 563).

After receiving an extension of time, Mr. Jah filed eight post-trial motions in addition to his *Brady* motion (Dkt. No. 584). The nine are addressed herein. This order follows full briefing and oral argument.

**ANALYSIS**

This order addresses one filing at a time, except where several filings comprise just one motion. Where possible, the sections below will address all factual arguments directed to the same issue in one fell swoop, even though arguments repeat in later filings. Docket numbers will direct the reader to the source of any given argument.

1. *BRADY* MOTION (DKT. NO. 555; OPPOSITION AT DKT. NO. 582).

Mr. Jah contends that the government ran afoul of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to obtain and turn over surveillance footage from the California Grand Casino in Pacheco, California. There, Mr. Jah met Alexis-Clark and Williams on October 31, 2018, and planned the November 3 arson attack on 126 Rassani Drive in Danville.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the prosecution may not suppress evidence favorable to an accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Among other things, *Brady* has since been extended to evidence that impeaches prosecution witnesses. *See Giglio v. United States*, 405 U.S. 150, 154–55 (1972). While a prosecutor must disclose all *Brady* material of which he or she has knowledge, the Supreme Court has also rejected the view that a prosecutor need *only* disclose evidence based on what he or she personally knows. Instead, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

This motion deals with two items of casino footage. One showed footage of the bar area, where the co-conspirators met. The second showed the entrance. Mr. Jah alleges that the government allowed the bar footage to spoil by not trying to obtain it fast enough and thus suppressed it. Next, he argues the government did not produce the entrance footage to him until trial. The entrance footage was played at trial and shows Mr. Jah and possibly Alexis-Clark entering the casino and traveling to and from the bathroom (Tr. 1309).

Very shortly after Mr. Jah was arrested, the government did obtain a subpoena for the casino for all footage of relevance and only the entrance footage survived. This order finds that the prosecution tried to get the evidence and tried promptly.

Prior orders resolving Mr. Jah's pre-indictment delay motions have already held that any bar footage would not have aided his cause (Dkt. No. 305, 519). Mr. Jah has long maintained that footage of this meeting would have allowed him to hire an expert to read lips and to decode hand movements. Mr. Jah further says now that he saw Williams record the bar

3

meeting on his phone. Furthermore, at the July 26 hearing, Mr. Jah argued that the phone records from the Motorola (recovered after the trial) show that it received an October 31 text from a phone associated with Williams. This text, he speculates, contained the audio file of the recording. In other words, Williams sent the recording to himself. This theory appears as likely (or unlikely) as universe of other possibilities. This order cannot credit it. It would also prove impossible to interpret hand gestures without context (*see* Dkt. No. 595 at 3).

In short, Mr. Jah argues that the contents of the meeting would have proven the absence of any agreement to commit arson (Dkt. Nos. 555, 587, 589, 595). This is after-the-fact speculation that tries to exploit the loss (by the casino) of the bar footage. The footage might just as easily, in the realm of speculation, have helped the prosecution (Dkt. Nos. 305 at 7, 519).

With respect to the prosecution's purported suppression of the evidence, Mr. Jah claims that the government "dup[]ed" the Court by representing that no casino footage was available when the entrance footage actually was (Dkt. No. 589 at 6). He also believes that his prior appointed counsel was duped or that she was part of the "cover up" (*id*. at 6–7). Mr. Jah appears to imply that the bar footage perhaps really *was* available, or alternatively that the government lied about the lack of any available footage and "suppressed" it from him by allowing it to be overwritten.

The government previously stated that law enforcement sought the casino footage but found it had already been deleted: "In November 2018, within weeks of the attacks, the government requested from the casino all recordings of Mr. Jah's meeting with his co-defendants. At that point, the casino could no longer recover any recording of the three co-defendants sitting at the bar" (Dkt. No. 271 at 13, *see also* Dkt. No. 512 at 4). During trial, the government also stated,

> MR. RUBINO: So the casino footage is excerpts of people walking to and through the entrance and the bathroom. Mr. Jah asked about the video recordings of people sitting at the bar. From what I understand there was no video of people sitting at the bar. But there was video of people coming and going, which I understood had been produced to Mr. Jah long ago. It was certainly made available for

4

inspection a few weeks ago when he came with his evidence list (Tr. 1308, 1309–10). Mr. Jah did not then deny the above representation (*see ibid*.).

The Court next asked, "Did [law enforcement] specifically ask [the casino] for images of the bar, bar area?" Special Agent Andrea Buenaventura of the Alcohol Tobacco Firearms and Explosives (ATF) agency reiterated the government's previous position: "Yes, Your Honor. We were told that the casino only keeps footage for 30 days, and we had made the request after the 30-day mark." The Court addressed the parties: "Well, I'm sorry that that evidence has been lost, but it is impossible to say that the Government is responsible for that loss [of surveillance footage], and I stand by my prior ruling" (*ibid*.).

That ruling still stands. At the hearing on July 26, 2021, Mr. Jah did not dispute that the government learned about the footage November 7, when it arrested Alexis-Clark. Nor did Mr. Jah dispute that the government sought a subpoena dated November 15, 2018. This is not a dilatory timeline. Even if Mr. Jah had been taken into federal custody immediately, the very capable federal defenders were not likely to have gotten a subpoena or the footage any faster. Additionally, the footage belonged to a private company, not a government agency, so the government had no special advantage in preserving it.

Furthermore, while the government did not volunteer the existence of the entrance footage, Mr. Jah's earlier concerns focused on footage that showed the bar meeting. Therefore, this order finds that the government did not misrepresent facts or suppress evidence.

Lastly, Mr. Jah raised a new argument at the July 26 hearing, claiming that various items of discovery (two memory cards, the contents of a GoPro camera, and at least one computer) were not produced. In response, the government quoted from a discovery letter to defense counsel in its file that listed Bates Numbers 290–300 and included at least two memory cards and an SD card associated with the GoPro, among other items. The government's records showed that Numbers 290–300 were produced March 13, 2019, April 30, 2019, and June 13, 2019.

The motion is **DENIED**.

### 2. MOTION TO ACQUIT (DKT. NOS. 589, 595; OPPOSITION AT DKT. NOS. 608, 612; REPLY AT 621).

At trial, the Court denied Mr. Jah's initial and his renewed Rule 29 motions: "There is ample proof to show every single element of the crime, including the interstate commerce requirement; and therefore, the Rule 29 motion is denied" (Tr. 1430). Here, in his second renewed motion for acquittal (spread over two filings), Mr. Jah reiterates familiar arguments.

A district court may enter a judgment of acquittal with respect to "any offense for which the evidence is insufficient to sustain a conviction." F.R.Cr.P. 29(a). A district court does not impose its own view of the facts. Instead, it asks whether, viewing the evidence in the light most favorable to the prosecution, any rational jury could have found the elements of the crime beyond a reasonable doubt. *See United States v. Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017). Even "[t]he testimony of one witness, if believed," and whose credibility the jury had the chance to evaluate, can establish guilt. *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970).

This order now addresses Mr. Jah's arguments one by one.

#### A. INTERSTATE COMMERCE.

Our jury instruction on interstate commerce has given Mr. Jah the greatest heartburn. Section 844(i) prohibits damaging or destroying any building or other real or personal property "used in any activity affecting interstate or foreign commerce or in any activity affecting interstate or foreign commerce." This section also covers attempt. Section 844(n) proscribes conspiracy to do the same. Congress' authority for this statute flows from its power to regulate "activities that substantially affect interstate commerce." *United States v. Lopez,* 514 U.S. 549, 558–59 (1995).

In *Lopez*, "the Supreme Court held that, to be regulated, *intra*state economic or commercial activities must substantially affect interstate commerce in the aggregate, while . . . non-commercial activities must individually have a substantial effect on interstate commerce." *United States v. Serang*, 156 F.3d 910, 913 (9th Cir. 1998), citing *Lopez*, 514 U.S. at 560–61 (emphasis added).

6

Our court of appeals has explained that some "class[es] of activities" always affect interstate commerce for purposes of Section 844(i). In our circuit, these include rental apartments (*United States v. Gomez*, 87 F.3d 1093, 1096 (9th Cir. 1996)), truck rentals (*United States v. Geiger*, 263 F.3d 1034, 1037–38 (9th Cir. 2001)), restaurants (*Serang*, 156 F.3d at 914 n.3), and handyman businesses (*United States v. Sakhanskiy*, 734 Fed. Appx. 454 (9th Cir. 2018) (unpublished)). The *Serang* ruling clarified the logic: a local restaurant falls within the class of activities described by *Lopez* because restaurants have "a *per se* substantial effect on interstate commerce." *Id.* at 913–14, citing *Russell v. United States*, 471 U.S. 858, 862 (1985).

Thus, for example, the district court in *Gomez* instructed the jury, "A building is used in interstate commerce, or any activity affecting interstate commerce, if the building itself is used for a business or commercial purpose or if that building purchases, sells, or uses goods that originated or came from out of state." *Gomez*, 87 F.3d at 1097. Logically, the instruction applies equally to home offices. And, in fact, in *Sakhanskiy*, our court of appeals gave this instruction with respect to arson against a handyman's home office:

> The second element of the offense of Arson . . . is that the building that was damaged or destroyed was used in interstate commerce or in any activity affecting interstate commerce. A building is used in interstate commerce or in any activity affecting interstate commerce if it is used for a commercial purpose.

*United States v. Sakhanskiy*, No. CR 13-00160-MCE, ECF No. 146-3 (E.D. Cal. Sept. 9, 2015); *see also United States v. Sakhanskiy*, 734 Fed. Appx. 454, 456 (9th Cir. 2018) (unpublished).

Like handyman businesses, restaurants, rental apartments, and truck rentals, a "local" law practice "is merely an element of a much broader commercial market." *Russell*, 471 U.S. at 862. Our jury instruction provided: "The government must prove . . . 126 Rassani Drive was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce at the time of the alleged conspiracy. A building is used in an activity affecting interstate commerce if the building is used for a commercial purpose" (Dkt. No. 567 ¶ 21).

7

During deliberations, the jury sent out a question. In relevant part it asked (Dkt. No. 569):

> In order to prove the second element does the building need to be used in a commercial use AND interstate commerce or does the building only need to be used for a commercial purpose.
>
> Presiding Juror
>
> → This would be sufficient to prove the second element.
>
> Wm Alsup
> 5-13-21  12:40 pm

Mr. Jah contends, "[A]nswering the jurors note caused for the interstate commerce element to be null and void" (Dkt. No. 589 at 8), and, for it to "omit[]" the interstate commerce element (*id*. at 5). This, he argues, defied the separation between the "truly national" and truly local, citing *Lopez*, 514 U.S. at 567.

He argues that *Sakhanskiy* is nonbinding and that the Court should have instructed the jury using the two-part test laid out in *Jones*: "The proper inquiry, we agree, 'is into the function of the building itself, and then a determination of whether that function affects interstate commerce.'" *Jones v. United States*, 529 U.S. 848, 854–55 (2000), quoting *United States v. Ryan,* 9 F.3d 660, 675 (8th Cir. 1993). Mr. Jah also cites *United States of America v. Williams*, 299 F.3d 250 (3rd Cir. 2002), a decision that affirmed a conviction under Section 844(i) for arson of an unoccupied, for-rent building. That district court had given the two-part instruction in *Jones* and the Third Circuit approved.

Our circuit has spoken to this issue, in *Sakhanskiy*. Given our circuit's and the Supreme Court's precedent, that decision persuades. *Jones* had found that a private "residence was not 'used in interstate . . . commerce' in part because there was no allegation that it 'served as a

8

home office or the locus of any commercial undertaking.'" *Sakhanskiy*, 734 Fed. Appx. at 454, quoting *Jones*, 529 U.S. at 856. *Sakhanskiy* inverted the test in *Jones* and tracked the language of *Gomez* and *Serang*. Even if *Sakhanskiy* had not been decided, *Gomez* and *Serang* are binding and would have compelled the conclusion that a jury need only find that the handyman's home was used for a commercial purpose.

Here, too, the market for lawyers affects interstate commerce in the aggregate because that market is both national and international; indeed, it is inseparable from almost all aspects of all commerce. Therefore, the jury only needed to find that the building was used for a commercial purpose. Mr. Jah counters that unlike Sakhanskiy, Attorney "Towey did not advertise his home, did not have a business license, nor was there any evidence of numerous office equipment manufactured by multinational or interstate vendors" (Dkt. No. 573 at 2–3). All of this, he says, comprised what "the Court held in *Sakhanskiy* to be sufficient" (*ibid*.). In fact, the *Sakhanskiy* decision described the home office set-up to determine if the building was *used* for a commercial purpose, not whether a home-office handyman business affected interstate commerce. *See Sakhanskiy*, 734 Fed. Appx. at 454.

Finally, Mr. Jah contends that the Court's instruction caused a constructive amendment of the indictment. It did not. The instructions explained the elements of Section 844(i) and (n). Mr. Jah also cites *United States v. Gradwell*, 243 U.S. 476, 487 (1917), for the proposition that courts must hold the government to a high burden to ensure that the conduct qualifies as the conduct that the law proscribes. This proposition is correct, and a rational jury could find that the government has carried its burden.

The motion to acquit for erroneous instruction on the interstate commerce element is **DENIED**.

### B. SUFFICIENCY OF THE EVIDENCE RE INTERSTATE COMMERCE.

Mr. Jah next argues that the government failed to prove an interstate commerce nexus: "[A]n acquittal is warranted, the interstate nexus under 18 USC 844(i) [*sic*] is not met without a showing that there is indeed some interstate character to the property involved" (*id*. at 10).

9

At trial, the government introduced ample evidence that 126 Rassani Drive was used for a commercial purpose. Towey testified that he practiced probate law and estate planning out of his home in Danville at the time of the attack (Tr. 786–87, 788, 890). He maintained one room as an office, with office supplies and no bed (Tr. 787–88). *Cf. Sakhanskiy*, 734 Fed. Appx. at 454. Towey's wife and adult daughter, who lived with her parents in November 2018, reiterated these points (Tr. 1197–98, 1200–01, 1220–21). Additionally, the government introduced a bank account statement listing Towey's home address, which showed both client trust and business operating accounts (TXs 8, 9, Tr. 791). On cross-examination, Mr. Jah elicited testimony that Towey had an out-of-state client in November 2018 (Tr. 797–98, *see also* 885, 886, 891). This is ample evidence.

At the hearing, Mr. Jah urged that this order require the level of proof about an interstate commerce nexus purportedly proven in *Pollack v. Hobbs*, 98 F. Supp. 2d 287, 294 (E.D.N.Y. 2000), *aff'd,* 8 F. App'x 37 (2d Cir. 2001). That decision affirmed that a defendant-owned property used as a business asset for both defendant's law practice and corporate ventures adequately satisfied the interstate commerce requirement. The volume of the evidence found adequate to prove interstate commerce in *Pollock*, a decision from a sister circuit, does not diminish the adequacy of evidence in our case.

Nor was it error to overrule Mr. Jah's objection to trial exhibit ten, Towey's legal document for an out-of-state client. The document was filed November 20, 2018. Although the filing post-dated the timeframe of the conspiracy, the document remained relevant to help the jury determine whether Towey used the home office in an activity affecting interstate commerce (Dkt. No. 573 at 4).

Next, Mr. Jah contends that the Court's decision to deny his requested *subpoenas duces tecum* for the Toweys' cell and home phone records, as well as bank account and tax information, prevented him from showing that the property "was not being used for interstate commerce," "because the home office work details were not presented even if [*sic*] just commercial purpose was acceptable, this conduct does not reflect" the statute (Dkt. Nos. 589 at 9, 573 at 3–4).

10

The Court granted more than fourteen of Mr. Jah's requests for *subpoenas* (*see* Dkt. Nos. 461, 462, 465, 466, 471, 478, 479, 485, 493, 494, 495, 496, 508, 517, 528, 533).

All *subpoena*-related filings remain *ex parte* and under seal, so this order will not detail the decision to deny home and cell phone records except to say that even if Mr. Jah could establish that all of the calls went to family members, perhaps Towey solely used email for client communication (*see* Dkt. Nos. 465, 466, 471, 485, 486). The bank and tax records, similarly, might have shown a lack of tax write-offs or perhaps personal spending. Turning over such records would have been extremely intrusive and burdensome. These records could present, at best, faint fodder for impeachment and would likely have been excluded under Rule 403. As stated, the record overwhelmingly showed that Towey practiced law from the building and thus that it was used for a commercial purpose. A rational jury could so find.

The motion to acquit is, on this ground, **DENIED**.

### C. SUFFICIENCY OF THE EVIDENCE RE CONSPIRACY.

Overwhelmingly, the evidence at trial showed that Mr. Jah led the conspiracy. Mr. Jah counters that no one received payment and that no meeting of the minds occurred (Dkt. No. 589 at 3, 4). He maintains that his text messages with co-conspirators showed no agreement to "specifically and intentionally commit arson" and that "no specific request was made of them" (Dkt. No. 590 at 2). Finally, he argues that the evidence showed he was merely present for *their* conspiracy. Based on these points, he asks the Court to "limit" his "liability" (Dkt. No. 589 at 5).

Here follows a digest of the evidence demonstrating conspiracy.

On October 16, Mr. Jah texted a list of six Bay Area addresses to Alexis-Clark without apparent explanation (TXs 29, 30, 33). In his direct testimony and in argument, Mr. Jah admitted sending the list but said that he did so to waste his codefendants' time (Tr. 1288–89). On October 19, Mr. Jah texted Alexis-Clark, "You're hired, Jobs 3,4, and 5" (TXs 25, 33). Alexis-Clark and Williams then firebombed or attempted to firebomb three of those addresses. Towey's home office appeared as number four on the list sent October 16. On October 25, Mr. Jah texted Alexis-Clark: "Tassajara Valley, Danville, California Little League . . . . Make sure

11

1    you have the right park" (TX 24 at 1). The attack on Towey's house occurred November 3,

2    2019. Hours after the attack, Jah texted Alexis-Clark, "I requested proof of services [*sic*] . . ."

3    (TX 24 at 2).

4          Alexis-Clark and Williams each testified that the list referred to arson targets. The three

5    used the October 31 meeting at the casino to plan the attacks. Williams testified that Mr. Jah

6    used the word "Molotov cocktail," that Mr. Jah coached Williams about how to launch a

7    Molotov cocktail, and that Mr. Jah told him to commit the arson. Alexis-Clark, for his part,

8    testified, "There was no doubt in my mind" that Mr. Jah wanted him to fire-bomb 126 Rassani

9    Drive, along with other properties. Although Mr. Jah used "code," this evidence is more than

10   adequate to establish a conspiracy to commit arson (Tr. 651, 656, 671, 751–52, 663–64, 671,

11   449, 445–46).

12         Mr. Jah leans on, among other cases, *United States v. Melchor-Lopez*, 627 F.2d 886, 891

13   (9th Cir. 1980). In contrast to that case, here the evidence of an agreement was ample. The

14   motion to acquit for insufficient evidence of the conspiracy is **DENIED**.

### D.     DUE PROCESS.

16   Under the guise of his motion for acquittal under Rule 29, Mr. Jah also alleges "due

17   Process violations, the constitutional infringements pertaining to the misrepresentation of facts

18   asserting that no casino video footage existed" (Dkt. No. 589 at 6). For the same reasons stated

19   in Part 1, no due process violation appears. To the extent Mr. Jah is arguing that the existence

20   of the entrance footage *means* that the bar footage exists, this conclusion remains unwarranted

21   on our record.

22         This order also interprets various of Mr. Jah's objections as motions to find due process

23   violations: "The pro se defendant is compelled to continue on because of the warning if

24   counsel does enter all previous filings will be withdrawn" (Dkt. No. 589 at 7). One of the prior

25   filings, he says, covered his concern that "out of two hundred jurors only one [A]frican

26   [A]merican appeared in the first trial ironically it was juror number one, a female" (*ibid.*). The

27   Court is also unaware of any prior filing about the fairness of the venire. Mr. Jah also fails to

28   specify the source of the "warning" itself, so this order cannot address it.

The motion for acquittal is, for the reasons stated, **DENIED**.

3.  **MOTION FOR A NEW TRIAL (DKT. NOS. 590, 595; OPPOSITION AT DKT. NOS. 608, 612; REPLY AT 621, 622).**

Mr. Jah repeats the above arguments when asking for a new trial. A district court "may grant a new trial to that defendant if the interests of justice so require." F.R.Cr.P. 33. A new trial is warranted "[i]f the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citations omitted).

### A.  *INTERSTATE COMMERCE.*

Mr. Jah contends that the Court improperly instructed the jury on the Section 844(i) and (n) interstate-commerce element. The different standard on a Rule 33 motion does not change the validity of our jury instruction. For the first time, he claims that the verdict form is defective was inadequate because it did not specify the grounds on which the jury found him guilty: "General verdict finding pro se defendant guilty may rest on an insufficient legal theory; a new trial is necessary" (Dkt. No. 595 at 2). However, *Griffin v. United States,* 502 U.S. 46, 49 (1991), provides that juries need not state the ground for their verdicts and verdict forms need not require that they do so. For the reasons stated in Section 2(A), the motion is **DENIED**.

### B.  *SPECIFIC INTENT INSTRUCTION.*

Mr. Jah also claims that the Court got the intent element of Section 844(i) and (n) wrong (Dkt. No. 590 at 2). Our instruction described the element as the "intent to advance or further some object or purpose of the conspiracy." It went on to describe the agreement to commit arson, the definition of malice as used in the arson statute, and the meaning of intentional action (Dkt. No. 567 at 7).

Contrary to the government's claim that Mr. Jah never asked for a specific intent instruction, during a charging conference, Mr. Jah asked the Court to insert a specific intent requirement, citing *United States v. Durham*, 825 F.2d 716, 718 (2d Cir. 1987). In *Durham*,

13

defendants wanted to argue that the aim of their conspiracy had been to "dupe" undercover agents out of some "advance money," rather than burn a building in order to kill an upstairs tenant, as the indictment had charged. *Ibid*. The Second Circuit explained that the jury instruction should have specified the object of the conspiracy, *i.e.* the "specific intent" to commit arson. *Ibid.*

At the charging conference, the Court denied the request, stating that our instruction already specified that the requisite intent was the intent to violate Section 844(i) (Tr. 1426–29). Mr. Jah now cites *People v. Swain,* 12 Cal. 4th 593 (1996), for the proposition that conspiracy is a specific intent crime. The government has adequately shown that Mr. Jah's state of mind included the intention that the elements of the arson statute be met, satisfying the test (which is merely persuasive) in *Swain*. *See id.* at 600.

Nothing that occurred at trial compels a different instruction than ours, which specified the object of the conspiracy (arson) and adequately explained intent. There was no evidence of an alternative goal for the conspiracy. The motion is **DENIED**.

### C. PROSECUTORIAL MISCONDUCT.

Mr. Jah here repeats his multi-faceted argument about lost or undisclosed casino footage. He states, "[A]ctions of the government also denied the *pro se* defendant of his previous counsels [*sic*] effective assistance." That is, had counsel known of the (entrance) footage, Mr. Jah claims, counsel would have challenged the chain of evidence and "verified in fact a preindictment delay was a valid claim" (Dkt. No. 590 at 5). The defense also would have made more searching discovery requests for casino footage (*see ibid.*).

Next, Mr. Jah newly alleges, without explanation, that the casino footage "time frame [*sic*]" was edited, presumably to delete footage of the bar area where he, Alexis-Clark, and Williams sat (*ibid.*). He claims injury to the fairness, integrity, and public reputation of the trial. Because there is nothing showing that the government withheld evidence or caused its spoilage, relief on this ground is **DENIED**.

14

#### D.     DUE PROCESS.

Mr. Jah claims that denial of his *subpoena duces tecum* requests deprived him of both impeachment and exculpatory evidence regarding interstate commerce. For the reasons stated above, the denial of the Toweys' phone, tax, and bank account records also does not amount to a violation warranting relief under Rule 33. On this ground, the motion is **DENIED**.

Additionally, this order interprets various arguments made in Mr. Jah's supplemental filings to *both* his motion to acquit and for a new trial as support for his motion for a new trial, with its more lenient standard (*see* Dkt. Nos. 595, 621). *First*, Mr. Jah states that he was prejudiced by being denied bail (Dkt. No. 595 at 4). Without a doubt, incarceration made Mr. Jah's preparation for trial more onerous, but the Court issued at least eight orders attempting to accommodate his ready access to discovery materials and ease the trial process (Dkt. Nos. 320, 401, 405, 411, 454, 535, 545, 606). This claim, without more, does not provide grounds for a new trial.

*Second*, Mr. Jah claims juror misconduct from jurors' "intentional [*sic*] failing to answer honestly material question on *voir dire* and failing to disclose material pertaining to social media negative comments and views against the Black Lives Matter Movement was apparant [*sic*] eth[n]ic bias" (Dkt. No. 595 at 3). He adds, juror "[q]uestionnaires were taken from *pro se* defendant by court order, preventing the jurors name info [*sic*]" (*ibid*.). He cites *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984), which provides a two-step test to evaluate juror bias.

Mr. Jah correctly states that the jurors filled out questionnaires before trial, a development of the COVID-19 era. The questionnaires expedited the *voir dire* process by allowing early dismissals of individuals who did not wish to serve due to concerns about COVID-19. On May 14, the day after the jury returned a verdict, the Court became aware of a message from Mr. Jah's daughter to Mr. Jah's paralegal that Mr. Jah wanted to see all the juror "instructions" and the "answers," which the Court interpreted to mean juror questionnaires. A May 14 order required both sides to turn over the juror questionnaires to the clerk's office immediately but stated, that the information "shall be held by the clerk and if either side needs

15

it for any post-trial briefing, arrangements will be made to view it" (Dkt. Nos. 564, 565, 566). Sometime the following week, Mr. Jah received the remainder of his materials back (minus the questionnaires). The Court granted Mr. Jah two continuances to file post-trial motions (*see* Dkt. Nos. 594, 614). The Court received no requests to view the questionnaires, so Mr. Jah cannot claim prejudice. Furthermore, since Mr. Jah received the remaining materials back within one week and received the two requested extensions, his claim of a Sixth Amendment violation is meritless (Dkt. No. 573 at 4).

*Third*, without developing the argument, Mr. Jah states that he was prejudiced by admission of a cell phone taken in the search of his daughter's apartment on November 7, 2018 (Dkt. No. 595 at 2). He alleges, as he previously has, that the search warrant was overbroad, that the warrant should have been served, and that the manner of the search was excessively violent (officers broke down a door). We previously denied relief based on these arguments (Dkt. No. 374). Nothing at trial or in this briefing warrants a change.

*Fourth*, Mr. Jah claims that the government's closing improperly characterized Mr. Jah's state-court litigation about his mother's estate:

> I was prejudiced by government's negative description and characterization during summation of trial pertaining to pro se defendants [*sic*] exercising of constitutional right to litigate in court this right was depicted in a prejudicial manner as was testimony allowed; the substantial right was twisted . . . causing the jury to be influenced that pro se defendant was unreasonable in using the court system for due process to protect property and inheritance as constitution allows. Fifth Amendment right [*sic*]

(*id*. at 4). Mr. Jah does not develop this due process argument further, nor name the government's specific objectionable statement, so the Court cannot evaluate his argument.

*Fifth*, Mr. Jah claims that the Court should have instructed on solicitation and withdrawal from the conspiracy (Dkt. No. 621 at 2). Mr. Jah did not mention solicitation during the first charging conference (*see* TX 1114–39), nor during the second (*see* TX 1314–26), nor in his proposed jury instructions (Dkt. Nos. 506, 453). At trial, Mr. Jah mentioned solicitation, and Penal Code Section 373, in opening and in closing. At closing he said (TX 1492):

16

> Speaking of getting paid, ask Your Honor a question when you get back there. Send it up to him. That's the process. When you have a question, you're going to write it on -- one of you guys will be the foreperson. You'll write it on there, and you'll send the judge. Ask the judge for the difference -- or the meaning of "solicitation." You heard Mr. Rubino talk about Jah hired them. Well, if that's the Government's theory, then ask what "solicitation" is.

Mr. Jah failed to ask the Court to instruct the jury on solicitation or withdrawal, however. He writes, "That's why the withdrawl [*sic*] instruction was proper" (Dkt. No. 621 at 3). This order interprets that sentence to mean that one *would have been* proper. Mr. Jah's failure to specifically request a solicitation or withdrawal instruction is fatal to his claim for a new trial on these grounds.

*Sixth,* Mr. Jah alleges that he did not receive the government's exhibit list until the day of trial, but the government filed it on April 21, 2021, well in advance of trial (Dkt. No. 505). It was amended on April 30, three days before trial began (Dkt. No. 528).

*Seventh*, Mr. Jah says the government lied when it said that coconspirators "discussed the plan for the arson attacks [*sic*] 'few days later' [after the casino meeting] when in fact as the record supports no communication after the 10-31-18 purported meeting . . . " (Dkt. No. 621 at 3, citing Dkt. No. 608 at 15). This reflects a misplaced modifier, nothing more. That is, the government intended to say that the arson attacks (not the conversations) occurred November 3, a few days after the October 31 meeting at the casino.

For the foregoing reasons, the motion for a new trial is **DENIED**.

4.   **MOTION TO ARREST JUDGMENT (DKT. NOS. 573, 588; OPPOSITION AT DKT. NO. 592).**

Federal Rule of Criminal Procedure 34(a) provides, "Upon the defendant's motion or on its own, the court must arrest judgment if the Court does not have jurisdiction of the charged offense. Two prior orders herein squarely addressed the jurisdiction question (Dkt. Nos. 276, 299). This order has also addressed all of Mr. Jah's substantive arguments for lack of jurisdiction. This ground cannot provide relief. The motion to arrest the judgment is, for the reasons stated above, **DENIED**.

5.   **MOTION IN RESPONSE TO MEMORANDUM OPINION (DKT. NO. 587; OPPOSITION AT DKT. NO. 592).**

In a Gish gallop, Mr. Jah moves for reconsideration of our prior memorandum opinion that denied his motion under *Trombetta*, 467 U.S. 479, and *Youngblood*, 488 U.S. 51 (Dkt. No. 562). He also accuses the government of obstructing justice and "fraud – deceit – trickery – cheat [*sic*]" (Dkt. No. 587 at 3).

Northern District of California Local Rule 7-9, applicable to criminal cases pursuant to Local Criminal Rule 2-1, requires leave of court to file for reconsideration of a motion. Mr. Jah has not filed for leave, nor does he meet any of the requirements.

Assuming, *arguendo*, this order were to entertain reconsideration, Mr. Jah offers no reason to reverse course. This order interprets his allegation of fraud, *etc.*, to mean he believes the lost phone, lost casino footage, or allegedly misleading statement about what casino footage was available, denied Mr. Jah a fair trial. None of those issues rose to the level of a *Trombetta-Youngblood* violation (*see also* Section 1).

At trial, the Court informed the jury about the missing Motorola. Agent Buenaventura of the ATF testified that Williams provided the phone during an interview with her (Dkt. No. 562 at 2, *see also* Tr. 1262). She also testified that that the Lafayette police officer physically accepted it from Williams and handed it to her (Tr. 1262). She then put it in storage (*id*. at 1261). Two FBI forensic analysts testified about efforts to retrieve the phone's contents (*id*. at 1270–74, 1276–85). The jury also received a cautionary instruction about lost evidence (Dkt. No. 567 ¶ 24):

> You have heard that the government failed to download the contents of a Motorola cell phone belonging to Dennis Williams. If you find that the government intentionally failed to preserve the contents of Dennis Williams' Motorola phone, and that the government knew or should have known it would be evidence in this case, you may infer, but are not required to infer, that the lost evidence was favorable to the government.

Mr. Jah protests that our prior order incorrectly stated how the ATF came to possess the Motorola. Our prior order stated that Williams "'readily' provided his phone to the ATF" (Dkt. No. 562 at 2). He is technically correct about phone's transit from Williams to the local

18

police officer, to Agent Buenaventura. His conclusion, however, that the "chain of custody was not provided and shows negligence" lacks merit because it does not explain how any purportedly undisclosed chain of custody damaged the defense (Dkt. No. 587 at 1).

Finally, Mr. Jah contends that reports about a wick and broken glass found at 126 Rassani Drive were provided during trial, too late for a defense expert to examine them (*id.* at 3). At trial, the Court questioned the government on this point. AUSA Rubino responded: "There was very brief testing done, Your Honor. And a report was prepared and it was previously produced to Mr. Jah" (Tr. 499–500). Mr. Jah did not object to this answer. Even if he had, his theory rests on the idea that a forensic report on the wick and glass shards would have shown that Towey or his family planted the objects. Nothing else in the record suggests this could have been true.

The motion to reconsider, and any *Trombetta-Youngblood* relief regarding the forensic report, are **DENIED**.

### 6. MOTION FOR FINDING OF PROSECUTORIAL MISCONDUCT (DKT. NO. 599; OPPOSITION AT DKT. NO. 617).

Mr. Jah contends that "the prosecutors [*sic*] remarks at closing denied him of a fair trial" (Dkt. No. 599 at 1). He appears to be referring to the explanation of interstate commerce. In closing, the government correctly stated the legal standard as the Court instructed in its charge to the jury (*compare* Tr. 1465, 1467, 1470, 1471, 1473, *with* Dkt. No. 567 at 8). For all the reasons stated in Section 2(A), this did not constitute "misconduct warranting new trial, mistrial, or acquittal" (Dkt. No. 599 at 1).

In a sharp left turn, Mr. Jah next offers another reason for finding that the lost Motorola was prosecutorial misconduct, presumably warranting victory on his *Trombetta-Youngblood* motion. He reasons that FBI Special Agent Kiegan Park, a witness in both trials, discussed "spoofing" in the first trial (*id*. at 2). Park agreed with Mr. Jah on cross examination that "spoofing" might refer to sending a message in a way that makes it appear to come from another's phone (*id*. at 2, Dkt. No. 428 at 128–29).

Mr. Jah next asserts that the text messages from Alexis-Clark, which included strong circumstantial evidence of the conspiracy, *were* spoofed. Since Alexis-Clark's texts are unreliable, Mr. Jah reasons, the communications with Williams would be even more important. Thus, losing the contents of Williams' Motorola prejudiced Mr. Jah. The speculative possibility of spoofed text messages cannot undo the mountain of evidence against Mr. Jah. The motion is **DENIED**.

## CONCLUSION

For the foregoing reasons, all nine defense motions are **DENIED**.

**IT IS SO ORDERED.**

Dated: July 30, 2021.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE